**ROSS GLOVE COMPANY**

v.

**UNITED STATES.**

R.D. 11763; Reappraisement
No. R68/11664.

United States Customs Court.

Feb. 25, 1972.

Mayer, Brown & Platt, Chicago, Ill. (Walter Treumann and J. Stanley Stroud, Chicago, Ill., of counsel), Barnes, Richardson & Colburn, New York City (Joseph Schwartz and Earl R. Lidstrom, New York City, of counsel), associate counsel, for plaintiff.

L. Patrick Gray, III, Asst. Atty. Gen. (Brian S. Goldstein and Patrick D. Gill, New York City, trial attorneys), for defendant.

RICHARDSON, Judge:

The merchandise of this appeal consists of 624 dozen pairs of men's fur-lined leather gloves which were exported from the Philippine Islands on or about August 31, 1962, entered at the port of

Milwaukee, Wisconsin, at $25.50 per unit value, and advanced in value upon appraisement to the unit value of $25.77 per dozen pairs, net, packed. No question is presented here concerning the appraised value of the imported gloves *per se*, said by the parties to have been arrived at under the constructed value basis as defined in 19 U.S.C.A., section 1401a(d) (section 402(d), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956). The plaintiff-importer contends that the imported gloves are "Philippine articles" within the meaning of a provision in a trade agreement existing between the United States and the Republic of the Philippines, entitled as such to the reduced rate of duty provided for in that agreement. The application of the trade agreement provision in question is dependent upon the value of certain of the component materials of the imported gloves; and trial was conducted to permit plaintiff to establish that the imported gloves are "Philippine articles" by reason of the "value" of said component materials.

The pertinent provisions of the Philippine Trade Agreement of July 4, 1946, as revised pursuant to the Philippine Trade Agreement Revision Act of 1955 [69 Stat. 413] read:

*"Agreement between the United States of America and the Republic of the Philippines concerning trade and related matters during a transitional period following the Institution of Philippine Independence, signed at Manila on July 4, 1946, as revised*

\*　\*　\*　\*　\*　\*

*"Article I*
\*　\*　\*　\*　\*　\*

"2. The ordinary customs duty to be collected on Philippine articles as defined in Subparagraph (f) of Paragraph 1 of the Protocol, other than those specified in the Schedule to Paragraph 2 of Article II, which during such portions of such period are entered, or withdrawn from ware-

house, in the United States for consumption, shall be determined by applying the following percentages of the United States duty as defined in Subparagraph (g) of Paragraph 1 of the Protocol:

\*　\*　\*　\*　\*　\*

"(c) During the period from January 1, 1962, to December 31, 1964, both dates inclusive, twenty per centum.

\*　\*　\*　\*　\*　\*

*"Protocol to accompany the agreement between the United States of America and the Republic of the Philippines concerning trade and related matters during a transitional period following the institution of Philippine Independence, signed at Manila on July 4, 1946, as revised*

\*　\*　\*　\*　\*　\*

"1. For the purpose of the Agreement—

\*　\*　\*　\*　\*　\*

"(f) The term 'Philippine article' means an article which is the product of the Philippines, *unless, in the case of an article produced with the use of materials imported into the Philippines from any foreign country (except the United States) the aggregate value of such imported materials at the time of importation into the Philippines was more than twenty per centum of the value of the article imported into the United States, the value of such article to be determined in accordance with, and as of the time provided by, the customs laws of the United States* in effect at the time of importation of such article. As used in this Subparagraph *the term 'value', when used in reference to a material imported into the Philippines, includes the value of the material ascertained under the customs laws of the Philippines in effect at the time of importation into the Philippines, and, if not included in such value, the cost of bringing the material to the Philippines, but does not include*

the cost of landing it at the port of importation, or customs duties collected in the Philippines. * * * [Emphasis supplied.]

█ Thus, the issue arising from the trade agreement involves the relationship between the value of the foreign materials incorporated into the gloves in the Philippines (namely, the rabbit skin fur linings) and the uncontroverted appraised value of the gloves, and simply stated, is whether the value of the linings amounted to more than 20 percent of the value of the gloves. At the trial, on motion of counsel for the government, without objection by counsel for the plaintiff, a document signed by a representative of plaintiff certifying the Philippine value of the merchandise in issue was excluded as a self-serving ruling excluding this document is restatement (R.113). It now appears that such a statement was required of plaintiff under section 16.26(2) (5) of the Customs Regulations. Therefore the versed and the document is hereby admitted into evidence. The relevant statement of Carl Ross as owner of Ross Glove Mfg. is as follows:

> The product covered by the attached Special Customs Invoice, cartons #28–99 annexed to this certificate of Philippine at the time it was subscribed before a notary public is the product of the Philippines. There were used in its production in the Philippines 624 dozen rabbit skins (at $4.86 per doz. + $.16 per doz. freight) of *foreign materials valued in the Philippines by the Philippine Custom's officers for the purpose of Philippine law* at 3,132.48, plus if not included in such unit values the cost of bringing the material to the Philippines. [Emphasis added.]

Section 16.26(2) (5) of the Customs Regulations authorizes the collector to accept with the invoice a certificate from the foreign manufacturer, producer, or exporter indicating, among other things, that the value of the foreign materials in the imported article coming into the United States from the Philippines was valued by the Philippine customs officers for the purposes of the Philippine customs laws.

At the trial, however, it was the contention of plaintiff's counsel, corroborated by testimony of plaintiff's witness, Carl Ross, that the merchandise at bar was not valued by the Philippine customs officials. Plaintiff's counsel took the position that the statute [22 U.S.C. 1360(a) (4)] refers to dutiable value, whether or not there has been an actual appraisement in the Philippines (R.5). And on this premise plaintiff has adduced in the record both testimonial and documentary evidence with a view toward establishing that the subject linings possessed a market value according to Philippine law of $4.86 per dozen pairs at the time of their importation into the Philippines.

As was the case with the court at the trial (R.5, 120, 157), the court's initial concern in this case is whether the matter of the value of foreign materials incorporated in the imported gloves may properly be the subject of collateral evidence of value marshaled and introduced into the record subsequent to the exportation of the gloves from the Philippines. And the court is unaided in this concern by the briefs of counsel who have called attention to no authorities on the subject. A literal interpretation of the words of the second sentence in paragraph 1(f) of the Protocol, read in connection with the first sentence of that paragraph, seems to compel the conclusion that the value of the foreign materials in merchandise exported from the Philippines to the United States must be determined administratively in the Philippines prior to exportation. Under the language of the Protocol not only must the value of the foreign materials be *ascertained under the customs laws of the Philippines* in effect at the time of importation into the Philippines [second sentence], but this value must be ascertained *at the time of importation* into the Philippines [first sentence]. Under this posture only the Philippine customs officials, in the very nature of things,

could have been intended by the contracting parties to be the agency to bring such a state of facts into existence —particularly so, in view of the singular admonition in the first sentence that the value of the completed article being exported to the United States is to be determined in the United States.

Should paragraph 1(f) of the Protocol be given a literal interpretation? It is to be noted that paragraph 1(f) of the Protocol is derived from 22 U.S.C. 1360(a) (4) which employed the same language insofar as is here material. It has been held by this court that where the language of a statute is subsequently adopted in a trade agreement the contracting parties are to be regarded as having intended the language of agreement to have the same meaning ascribed to it in the statute. Seaboard Lumber Sales Co., Ltd. v. United States, 5 Cust.Ct. 161, C.D. 391 (1940).

What then was the intent of Congress in the enactment of section 1360(a) (4), the progenitor of paragraph 1(f) of the Protocol in question? In reporting out H.R. 5856 and recommending its passage without amendment, the House Ways and Means Committee report stated with respect to section 1360(a) (4):[1]

. . . This concept of "product" [product of the Philippines] is similar to that which has been evolved over a long period of years under our drawback laws (sec. 313 of the 1930 Tariff Act, as amended) under which refund of customs duties is made on the exportation of articles manufactured or produced in the United States with the use of imported duty paid materials.

\* &ast; &ast; &ast; &ast; &ast;

This definition makes use of and is in effect a statutory endorsement of the concept of Philippine products which have heretofore been granted free entry into the United States under section 301 of the Tariff Act of 1930, as amended, and precedent statutes: The language used in the course of the definition "produced with the use of materials imported" is substantially the language used in section 313 of the Tariff Act of 1930, as amended, granting, on the exportation of articles manufactured or produced in the United States "with the use of imported merchandise" a draw-back of the duties paid on such imported merchandise. . . .

And section 301 which is referred to in the House report, and which was repealed with the enactment of section 1360(a) (4), reads in part:

. . . all articles . . . manufactured in the Philippine Islands from materials . . . which do not contain foreign materials to the value of more than 20 per centum of their total value, upon which no drawback of customs duties has been allowed therein, coming into the United States from the Philippine Islands shall hereafter be admitted free of duty. . . .

The reference in section 301 to the incidence of drawback allowance upon foreign materials incorporated into articles coming into the United States from the Philippines clearly evidences a Congressional expectation that the value of the foreign materials in the exported articles be known by the Philippine customs officials prior to exportation of said articles to the United States to aid the determination of the qualification of such articles for duty-free admission into the United States vis-a-vis the incidence of drawback allowance. And under implementing customs regulations the value of the foreign materials in such articles was in fact required to be ascertained in the Philippines. See Article 257(c) of the 1931 Customs Regulations; Article 260(c) of the 1937 Customs Regulations; and compare the uncontroverted facts in United States v. M.S. Cowen & Co., 32 CCPA 40, 42, C.A.D. 283 (1944), regarding, the certificate of origin. Moreover, under the trade agreement language at bar the burden of making the determination as to the value of the

1. U.S.Cong.Serv. '46, pp. 1149–1150 [79th Cong., 2d Sess.].

foreign materials does not appear to have shifted from the exporting country to the importing country notwithstanding the fact that the incidence of drawback allowance on the foreign materials is no longer a factor to be taken into consideration in connection with the exemption provided for in paragraph 1(f) *via* section 1360(a) (4). The substitute language in the Congressional shift from former section 301 to section 1360(a) (4) still appears to contemplate an administrative involvement of customs officials in the Philippines as in the former statute. Hence, in view of the expressed Congressional purpose noted above to conform section 1360(a) (4) to the predecessor statute [section 301] as much as possible, a literal interpretation of the substitute language would seem to be consistent with that objective, in the court's opinion.

It was pointed out by plaintiff's counsel at the trial that the non-dutiable status of the foreign materials at bar precluded a determination of value as to the foreign materials by the customs officials there since the Philippine valuation laws only prescribe methods of valuation when merchandise is subject to duty in the Philippines.

This contention proceeds upon the assumption that the dutiable status of merchandise entering the Philippines furnishes the *only* occasion for Philippine authorities to value merchandise there, when in point of fact, the reciprocal commitment of the Republic of the Philippines to the requirements of paragraph 1(f) of the Protocol (by adherence to which the Philippine Republic obtains the benefits of the duty exemptions allowed thereby) furnishes still *another* occasion for Philippine customs authorities to value merchandise they know to be destined for exportation to the United States when imported, consistent with their past practices. See United States v. M. S. Cowen & Co., *supra*.

It, therefore, follows from the views expressed herein with respect to language appearing in paragraph 1(f) of the Protocol that the role of the reappraising court here is to provide a forum by means of which an importer may marshal and spread upon the record evidence establishing that the value of foreign materials used in an article imported from the Philippines was ascertained in a particular amount by the customs officials there prior to exportation of said article in accordance with the requirements of that trade agreement provision. And since such a role does not encompass or envision *de novo* value evidence in a collateral proceeding, evidence of what the law of the Philippines is respecting the valuation of merchandise imported into that Republic, and how that law might best be proven in court does not comply with the requirements of the Protocol.

In this case plaintiff admits that the value of the foreign materials in the gloves at bar had not been determined by the customs officials in the Philippines. Consequently, no other question is properly before this court in view of the fact that the appraised value is not challenged.

Therefore, the court finds as facts:

1. That the merchandise in issue consists of 624 dozen pairs of fur-lined men's leather gloves which were manufactured in the Philippines with fur linings which were not of Philippine or United States origin, and exported therefrom to the United States on or about August 31, 1962.

2. That said merchandise was appraised upon entry at the port of Milwaukee, Wisconsin, at $25.77 per dozen pairs, net, packed, on the basis of constructed value as defined in 19 U.S.C.A., section 1401a(d) (section 402(d), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956).

3. That the value of the said fur linings was not ascertained by the Philippine customs officials under the customs

laws of the Republic of the Philippines at the time of their importation into the Philippines.

On these facts the court concludes as matters of law:

1. That plaintiff-importer has failed to establish that the merchandise covered by the instant reappraisement appeal constitutes "Philippine articles" within the meaning of that term as used in paragraph 1(f) of the Protocol to the revised trade agreement existing between the United States and the Republic of the Philippines, dated September 6, 1955, and promulgated in T.D. 53965.

2. That constructed value as defined in 19 U.S.C.A., section 1401a(d) (section 402(d), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956) is the proper basis for the determination of the value of the said merchandise.

3. That such constructed value is the appraised value herein.