**ROSS GLOVE COMPANY**

v.

**UNITED STATES.**

**A.R.D. 318; Reappraisement No. R68/11664.**

United States Customs Court, First Division, Appellate Term.

Sept. 26, 1973.

Mayer, Brown & Platt, Chicago, Ill. and Barnes, Richardson & Colburn, New York City (Joseph Schwartz, New York City, Walter Treumann, and J. Stanley Stroud, Chicago, Ill., of counsel), for appellant.

Irving Jaffe, Acting Asst. Atty. Gen. (Patrick D. Gill, New York City, trial attorney), for appellee.

Before WATSON, MALETZ and RE, Judges.

RE, Judge:

This is an application for review of the decision and judgment of the trial court in Ross Glove Company v. United States, 68 Cust.Ct. 236, R.D. 11763, 337 F.Supp. 907 (1972). The trial court affirmed the appraised value of 624 dozen pairs of men's fur-lined leather gloves which were manufactured in the Philippines with the use, in part, of Belgian fur linings. The basis of the holding was that the gloves were not "Philippine articles" within the meaning of paragraph 1(f) of the Protocol to the revised executive trade agreement entered into by the President of the United States and the President of the Philippines in September 1955 (T.D. 53965), as authorized by section 201 of the Philippine Trade Agreement Revision Act of 1955, 69 Stat. 413 (22 U.S.C. § 1372). The trade agreement entitles Philippine articles to a reduced rate of duty, as provided for therein, upon their importation into the United States.

The gloves were exported from the Philippines by the manufacturer and seller, Ross Glove Manufacturing, on August 31, 1962, and entered at the port of Milwaukee (Sheboygan), Wisconsin on October 15, 1962 by the importer-appellant. The merchandise was entered at a value of $25.50 per dozen pairs (hereinafter d.p.) but was advanced in value in the appraisement to $25.77 d.p., net, packed, on the basis of constructed value as defined in section 402(d) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956 (19 U.S.C. § 1401a(d)).

Appellant does not challenge the basis of appraisement nor the value found for the imported articles by the appraising officer. Rather, it contends that the government erroneously determined, "as part of its appraisement, that the value of the foreign materials (Belgian fur linings) used in the manufacture of the gloves in the Philippines exceeded 20% of the appraised value, thereby depriving * * * the gloves of the reduced rate of United States duty [benefits] to which Philippine articles, as defined in the Protocol, are eligible" under article 1, § 2 of section 201 of the Philippine Trade Agreement Revision Act of 1955.

Section 201 of the 1955 Act authorizes the President of the United States to enter into an agreement with the President of the Philippines revising the executive agreement concerning trade and related matters entered into by the presidents of both countries on July 4, 1946, "so that such executive agreement, as so revised, will read as follows:"

\*   \*   \*   \*   \*   \*

"ARTICLE I

\*   \*   \*   \*   \*   \*

"2. The ordinary customs duty to be collected on Philippine articles as defined in Subparagraph (f) of Paragraph 1 of the Protocol, other than those specified in the Schedule to Paragraph 2 of Article II, which during such portions of such period are entered, or withdrawn from warehouse, in the United States for consumption, shall be determined by applying the following percentages of the United States duty as defined in Subparagraph (g) of Paragraph 1 of the Protocol:

\*   \*   \*   \*   \*   \*

"(c) During the period from January 1, 1962, to December 31, 1964, both dates inclusive, twenty per centum.

\*   \*   \*   \*   \*   \*

"PROTOCOL TO ACCOMPANY THE AGREEMENT BETWEEN THE UNITED STATES OF AMERICA AND THE REPUBLIC OF THE PHILIPPINES CONCERNING TRADE AND RELATED MATTERS DURING A TRANSITIONAL PERIOD FOLLOWING THE INSTITUTION OF PHILIPPINE INDEPENDENCE, SIGNED AT MANILA ON JULY 4, 1946, AS REVISED

\*   \*   \*   \*   \*   \*

"1. For the purpose of the Agreement—

\*   \*   \*   \*   \*   \*

"(f) The term 'Philippine article' means an article which is the product of the Philippines, un-less, in the case of an article produced with the use of materials imported into the Philippines from any foreign country (except the United States) the aggregate value of such imported materials at the time of importation into the Philippines was more than twenty per centum of the value of the article imported into the United States, the value of such article to be determined in accordance with, and as of the time provided by, the customs laws of the United States in effect at the time of importation of such article. As used in this Subparagraph the term 'value', when used in reference to a material imported into the Philippines, includes the value of the material ascertained under the customs laws of the Philippines in effect at the time of importation into the Philippines, and, if not included in such value, the cost of bringing the material to the Philippines, but does not include the cost of landing it at the port of importation, or customs duties collected in the Philippines. For the purposes of this Subparagraph any imported material, used in the production of an article in the Philippines, shall be considered as having been used in the production of an article subsequently produced in the Philippines, which is the product of a chain of production in the Philippines in the course of which an article, which is the product of one stage of the chain, is used by its producer or another person, in a subsequent stage of the chain, as a material in the production of another article. \*   \*   \*"

It was established at the trial that the value of the Belgian fur linings was not ascertained by the Philippine customs officials upon their importation into the

Philippines as they were entered under bond for exportation; and that under Philippine customs laws such entries are not appraised as they are not subject to duty.

The bulk of the testimonial and documentary evidence received at the trial relates to appellant's efforts to establish (1) the value of the Belgian fur linings under Philippine customs laws at the time of their importation into that country, and (2) that such value is less than 20 percent of the appraised value of the gloves as determined by United States customs officials upon their importation into the United States.

Appellee contends that, under the terms of the Protocol, the value of the foreign materials must be ascertained by the Philippine customs officials at the time of their importation into that country, and that appellant could not estab-lish its claim by *de novo* evidence in this court of what the value of the fur linings would have been under Philippine law.

Appellee renews before this court a jurisdictional question it raised unsuccessfully below, on a motion to dismiss, wherein it contended that the instant appeal for reappraisement does not challenge the appraised value of the *gloves*, and hence should be dismissed as not raising an issue appropriate for determination in a reappraisement proceeding under sections 500(a) and 501(a) of the Tariff Act of 1930.[1] Appellee argues that the importer's claim that the gloves are "Philippine articles" entitled to a reduced rate of duty involves questions of classification[2] and duty rates which may be raised only after liquidation of the entry by way of timely protest filed pursuant to section 514, Tariff Act of 1930.[3]

1. Sec. 500(a) (19 U.S.C. § 1500(a)), in effect at the time of entry, provided that—
   "(a) Appraiser.—It shall be the duty of the appraiser under such rules and regulations as the Secretary of the Treasury may prescribe—
   (1) To appraise the merchandise in the unit of quantity in which the merchandise is usually bought and sold by ascertaining or estimating the value thereof by all reasonable ways and means in his power, any statement of cost or cost of production in any invoice, affidavit, declaration, or other document to the contrary notwithstanding;
   (2) To ascertain the number of yards, parcels, or quantities of the merchandise ordered or designated for examination;
   (3) To ascertain whether the merchandise has been truly and correctly invoiced;
   (4) To describe the merchandise in order that the collector may determine the dutiable classification thereof; and
   (5) To report his decisions to the collector."
   Sec. 501(a) (19 U.S.C. § 1501(a)), in effect at that time, provided that—
   "(a) The collector shall give written notice of appraisement to the consignee, his agent, or his attorney, if (1) the appraised value is higher than the entered value, or (2) a change in the classification of the merchandise results from the appraiser's determination of value, or (3) in any case, if the consignee, his agent, or his attorney requests such notice in writing before appraisement, setting forth a substantial reason for

requesting the notice. The decision of the appraiser, including all determinations entering into the same, shall be final and conclusive upon all parties unless a written appeal for a reappraisement is filed with or mailed to the United States Customs Court by the collector within sixty days after the date of the appraiser's report, or filed by the consignee or his agent with the collector within thirty days * * *."

2. Sec. 505, Tariff Act of 1930 (19 U.S.C. § 1505) in effect at the time of entry, provided that—
   "* * * * Upon receipt of the appraiser's report and of the various reports of landing, weight, gauge, or measurement the collector shall ascertain, fix, and liquidate the rate and amount of duties to be paid on such merchandise as provided by law and shall give notice of such liquidation in the form and manner prescribed by the Secretary of the Treasury * * *."

3. Sec. 514 (19 U.S.C. § 1514) provided at the time of entry that—
   "* * * * all decisions of the collector, including the legality of all orders and findings entering into the same, as to the rate and amount of duties chargeable, and as to all exactions of whatever character (within the jurisdiction of the Secretary of the Treasury), * * * shall, upon the expiration of sixty days after the date of such liquidation, reliquidation, decision, or refusal, be final and conclusive upon all persons (including the United States and any

Appellee's motion was denied by the trial judge in an order entered without opinion prior to trial.

## DECISION OF THE TRIAL COURT

The trial court noted that the issue arising from the trade agreement was whether the value of the fur linings amounted to more than 20 percent of the value of the gloves, but stated that its initial concern was "whether the matter of the value of foreign materials incorporated in the imported gloves may properly be the subject of collateral evidence of value marshaled and introduced into the record subsequent to the exportation of the gloves from the Philippines" (68 Cust.Ct. at 239, 337 F.Supp. at 909).

The court construed the Protocol as precluding such evidence of value, stating:

"A literal interpretation of the words of the second sentence in paragraph 1(f) of the Protocol, read in connection with the first sentence of that paragraph, seems to compel the conclusion that the value of the foreign materials in merchandise exported from the Philippines to the United States must be determined administratively in the Philippines prior to exportation. Under the language of the Protocol not only must the value of the foreign materials be *ascertained under the customs laws of the Philippines* in effect at the time of importation into the Philippines [second sentence], but this value must be ascertained *at the time of importation* into the Philippines [first sentence]. Under this posture only the Philippine customs officials, in the very nature of things, could have been intended by the contracting parties to be the agency to bring such a state of facts into existence—particularly so, in view of

the singular admonition in the first sentence that the value of the completed article being exported to the United States is to be determined in the United States. [Emphasis in original.]" 68 Cust.Ct. at 239–240, 337 F.Supp. at 909.

Noting that paragraph 1(f) of the Protocol was derived from 22 U.S.C. § 1360(a)(4) (Philippine Trade Agreement Act of 1946), the trial court quoted, in part, from a reference to section 1360(a)(4) contained in the House Ways and Means Committee Report approving passage of the 1946 Act (H.R. 5856). It also cited the 1931 and 1937 Customs Regulations, promulgated under section 301, Tariff Act of 1930, predecessor to the 1946 Philippine Trade Agreement Act, as supporting its interpretation of the Protocol language in issue herein.

The court concluded that the importer had failed to establish that the merchandise constituted "Philippine articles" within the meaning of the Protocol, stating:

"It, therefore, follows from the views expressed herein with respect to language appearing in paragraph 1(f) of the Protocol that the role of the reappraising court here is to provide a forum by means of which an importer may marshal and spread upon the record evidence establishing that the value of foreign materials used in an article imported from the Philippines was ascertained in a particular amount by the customs officials there prior to exportation of said article in accordance with the requirements of that trade agreement provision. And since such a role does not encompass or envision *de novo* value evidence in a collateral proceeding, evidence of what the law of the Philippines is respecting the valuation of merchandise imported into that Republic, and how

officer thereof), unless the importer, consignee, or agent of the person paying such charge or exaction, * * * shall, within sixty days after, but not before such liquidation, * * * file a protest in writing

with the collector setting forth distinctly and specifically, and in respect to each entry, payment, claim, decision, or refusal, the reasons for the objection thereto. * * * "

that law might best be proven in court does not comply with the requirements of the Protocol.

"In this case plaintiff admits that the value of the foreign materials in the gloves at bar had not been determined by the customs officials in the Philippines. Consequently, no other question is properly before this court in view of the fact that the appraised value is not challenged." 68 Cust.Ct. at 242, 337 F.Supp. at 911.

This appellate term agrees with the trial court's initial determination that it has jurisdiction over the present matter, but reverses its decision and judgment and remands the case to the trial judge for consideration of the evidence relevant to the value of the fur linings in accordance with this decision.

## JURISDICTION

Appellee's claim that the appeal for reappraisement does not raise an issue cognizable in reappraisement proceedings is without merit.

In order to be entitled to the reduced rate of duty allowed "Philippine articles" under the 1955 trade agreement (20 percent of United States customs duty), the gloves must not only be a "product" of the Philippines (a fact conceded in the oral argument herein), but the value of the Belgian fur linings at the time of their importation into the Philippines must not exceed 20 percent, or $5.15 d.p., of the appraised value ($25.77 d.p.) of the gloves.

It is not disputed that the gloves were entered as "Philippine articles" under paragraph 1532 of the Tariff Act of 1930, as modified, at the rate of 25 per centum ad valorem. The summary sheet (Customs Form 6417) indicates that only 20 percent of the estimated duties was deposited at the time of entry in accordance with appellant's claim for the reduced duty benefits allowed Philippine articles under the revised trade agreement. Although the foreign materials were not appraised by the Philippine customs officials, a certificate or origin

filed by the shipper and received in evidence indicates that the importer was claiming a value of $5.02 d.p. for the foreign materials, less than 20 percent of the appraised value of the gloves.

Subsequently, under letter dated August 9, 1963, attached to the official papers herein, the importer's attorneys requested the Milwaukee collector of customs to send them notice of appraisement of the merchandise covered by the involved entry. They stated as their reason that "we desire confirmation that the merchandise qualifies for the tariff reduction provided under the United States-Philippine Trade Agreement of 1946, as revised."

A handwritten sheet prepared by the appraiser, which is attached to the entry papers, indicates his treatment of the merchandise listed on the entry. It covers three different styles of gloves, items "A", "B" and "C", of which only item "B" (the fur-lined gloves) is in controversy. After listing the values found for each item (all were advanced in the appraisement) the appraiser made the following notation:

"Item A—classified under par. 1532 (a) @ $5.50 per doz. prs., less 80% (Philippine articles)

Item B—classified under par. 1532(a) @ 25% ad valorem

Item C—classified under par. 1114(b) @ 37½¢ + 25%, less 80% (Philippine articles)"

The appraiser's red-inked notation, "RR" (meaning "lower rate applies", as explained on the summary sheet), appears next to the invoice totals shown for items "A" and "C" on the Special Customs Invoice, but are omitted from item "B".

It is clear that, in writing in the terms "less 80%", "Philippine articles", and "RR" next to items "A" and "C", but omitting them from item "B", the appraiser found the value of the foreign materials to be more than 20 percent of the appraised value of the "Item B" gloves, and hence not entitled to the reduced rate of duty allowed Philippine

articles in 1962 under the Protocol to the 1955 trade agreement. Thus, when the appraiser advanced the value of the gloves to $25.77 d.p., he also advanced the value of the foreign materials to some undisclosed higher amount which exceeded 20 percent of the appraised unit value of the gloves.

The foregoing circumstances attending the entry and appraisement of the merchandise, as shown on the official papers in the court file, raise two justiciable issues in the claim of "Philippine articles" for the articles at bar.

The first, which is not yet ripe for judicial review, pertains to the classification decision to be made by the appropriate customs officer, namely, whether the merchandise is classifiable as a "Philippine article" under paragraph 1(f) of the Protocol to the 1955 trade agreement and therefore subject to assessment at only 20 percent of the ordinary customs duty. See Duroch Limited, Inc. v. United States, 21 Cust.Ct. 3, C.D. 1116 (1948).

Although the determination of the classification of the gloves may necessitate making certain subsidiary fact findings, such as the origin of the goods and whether they are a "product" of the Philippines, it turns primarily upon another issue—one of value—i. e., whether the value of the fur linings under Philippine customs law is more than 20 percent of the value of the gloves as appraised upon their importation into the United States. The collector, however, is precluded from making such appraisement, since, under section 500(a) of the Tariff Act of 1930 determination of val-

ue is a function expressly reserved to the appraiser.

Furthermore section 503(b) [4] of the Tariff Act of 1930, as amended (19 U. S.C. § 1503(b)), provided, at the time of entry herein, that when the rate of duty is based upon or regulated in any manner by the value of the merchandise, the value found by the appraiser must be utilized in determining the rate. Thus, the classifying officer (collector) was bound by statute to make his classification in accordance with the appraiser's finding of value, from which he could not deviate. Whittaker, Clark & Daniels, Inc. v. United States, 34 CCPA 164, C.A.D. 360 (1947); Richard Nathan Corporation v. United States, 39 Cust.Ct. 523, Abstract 61419 (1957). Appellee's assertion that the classifying officer "has to be satisfied as to the value" of the fur linings for purposes of determining whether the goods are "Philippine articles" in liquidating the entry (brief at 22) is in derogation of sections 500(a) and 503(b) and constitutes approval of an action by that officer that would be illegal, *ultra vires* and void. [5]

Not only is the collector bound by the appraisement, but, under section 501(a) of the Tariff Act of 1930, he was required to give a written notice of appraisement where a change in the classification of the merchandise resulted from the appraiser's determination of value. This requirement also applied where the value found by the appraiser for the foreign materials used in an imported article would affect the classification of the article. As such finding comprises part of the appraisement, no-

---

4. Sec. 503(b) provided that—
   "For the purpose of determining the rate of duty to be assessed upon any merchandise when the rate is based upon or regulated in any manner by the value of the merchandise, the final appraised value shall  *  *  * be taken to be the value of the merchandise."

5. Under the Customs Court Act of 1970, Pub.L. 91–271, imported merchandise is appraised and classified at the same time in liquidation of the entry. A protest filed against the decision of the appropriate customs officer must raise all issues relating to the dutiable status of the goods, including the appraised value and classification. Only one civil action may be brought in the Customs Court to contest the denial of the protest so that the court may decide in a single proceeding all issues raised in the protest. The case at bar, which involves a 1962 entry of merchandise, is governed by the laws and procedures in effect prior to the 1970 Act.

tice must be given to the importer in order that he may have an opportunity of challenging the value.[6] Delaware Watch Co., Inc. v. United States, 60 Cust.Ct. 747, R.D. 11467 (1968); Duroch Limited, Inc. v. United States, 21 Cust.Ct. 3, C.D. 1116 (1948).

■ In short, the importer must invoke the jurisdiction of this court on questions of value by appeal for reappraisement; otherwise, "he is without remedy to contest the rate of duty selected by the collector in liquidation." Duroch Limited, Inc. v. United States, 21 Cust.Ct. at 7. In T. S. Kennedy Co. v. United States, 2 Cust.Ct. 404, C.D. 165 (1939), the court held that the appraisement may not be attacked collaterally in a protest proceeding by offering evidence therein as to the allegedly correct value of the merchandise. The court therein stated:

"On consideration it is held that questions of the amounts of values on appraisement must be litigated on reappraisement appeal. Also that that principle applies to the amounts of values which indirectly affect the classification by shifting the merchandise, as here, from one classification bracket to another." 2 Cust.Ct. at 405.

■ The second issue raised by appellant's claim under the Protocol to the 1955 Philippine trade agreement, which relates solely to value—i. e., the value of the fur linings vis-à-vis the value of the gloves—is litigable only in a reappraisement proceeding instituted by filing a timely appeal for reappraisement under section 501(a) of the Tariff Act of 1930, as was done herein. In such a proceeding the court may consider all of the issues relating to "[t]he decision of the appraiser, including all determinations entering into same." It is true that appellant's "Statement Under Rule 15" uses language that is perhaps more appropriate to a classification claim than to one concerning value, but there can be

no doubt that the thrust of appellant's claim is to establish a value for the foreign material.

## THE PROTOCOL

■ The best evidence of the meaning of a statute is the language of the statute itself, and that language is given its ordinary meaning in the absence of any cogent reason to the contrary. Plant Products Corporation v. United States, 44 CCPA 183, C.A.D. 658 (1957). The principal canon for the construction of statutes is to so interpret them as to carry out the legislative intent. Sandoz Chemical Works, Inc. v. United States, 43 CCPA 152, C.A.D. 623 (1956).

Upon reading the entire language of paragraph 1(f) of the Protocol, and examining, in particular, the provision relating to ascertainment of the value of foreign materials imported into the Philippines within the full context of the definition of "Philippine article" contained therein, this court cannot agree with the conclusion reached by the trial court. Although the value of the foreign materials must be determined under the Philippine customs laws in effect at the time of importation into that country, there is no requirement that it be ascertained by the Philippine customs officials at such time.

It is significant to note that the method prescribed in paragraph 1(f) for ascertaining the value of *foreign materials* imported into the *Philippines* differs in one important respect from that required for determining the value of Philippine *articles* imported into the United States. With regard to the former, the Protocol stipulates only that the value of the foreign material be ascertained—

" * * * under the customs laws of the Philippines in effect at the time of importation into the Philippines,"

---

6. The copy of the notice of appraisement form (C.F. 4301) received by the importer herein indicates that the only reasons given for

notification thereof were that the appraised value exceeded the entered value and that it was pursuant to written request.

whereas the value of the Philippine articles imported into the United States is to be determined—

"* * * in accordance with, *and as of the time provided by*, the customs laws of the United States in effect at the time of importation of such article. [Emphasis added.]"

The differing requirements imposed on the valuation procedures to be followed in appraising foreign materials imported into the Philippines, and Philippine articles imported into the United States, are not a result of legislative oversight. It seems clear and unambiguous, from the express inclusion of the aforecited requirement "and as of the time provided by" in the sentence of paragraph 1(f) relating to valuation of Philippine articles imported into the United States, and its omission from the sentence therein respecting valuation of foreign materials into the Philippines, that Congress did not intend to require an ascertainment of the foreign materials by Philippine customs officials at the time of their importation into that country. Indeed, it would be a distortion of what this court plainly perceives to be the legislative intent to adopt a construction that would tack on to the provision relating to valuation of foreign materials coming into the Philippines a time restriction that is clearly confined to the provision concerning the valuation of Philippine articles imported into the United States.

This court's construction of paragraph 1(f) of the Protocol to the Philippine Trade Agreement Revision Act of 1955 is supported by the legislative history of that provision and by the various customs regulations promulgated thereunder. These sources indicate that Congress contemplated that the reduced duty benefits allowed under the trade agreement be extended to Philippine articles containing foreign materials which were not appraised upon their importa-

tion into the Philippines; and that the value of such foreign materials may be ascertained by United States officials upon importation of the Philippine articles into the United States.

Thus, section 16.26(c) of the Customs Regulations (19 C.F.R. 16.26(c), rev. 1961) provides, in language unchanged through the present, that when any total or partial exemption from duty is claimed on the ground that an importation is a "Philippine article", the collector "may accept" a certificate of Philippine origin in one of the forms specified in subsection (d) thereof as satisfactory evidence that the importation is a "Philippine article",[7] or he may satisfy himself of such fact—

"* * * *by other reasonable ways and means if*, taking into consideration the kind and value of the goods and the circumstances of importation, he *deems a certificate unnecessary.* [Emphasis added.]"

Not only may production of a certificate be unnecessary, but even more significantly, subsection (d)(3) thereof provides for a form of certificate which expressly does away with the necessity of even showing an appraisement by Philippine customs officials of the foreign materials imported into the Philippines. That certificate reads as follows:

"The product covered by the ——

────────────────────────────
(Describe above the invoice, bill of lading, or other document or statement identifying the shipment)

annexed or appended to this certificate of Philippine origin at the time it was subscribed is the product of the Philippines. There were or may have been used in its production in the Philippines foreign materials (other than those which are of the growth, product, or manufacture of the United States).

*It is impracticable to ascertain* the exact number of units of foreign ma-

---

7. Although it has no bearing on this decision, it is noted that the certificate filed with the collector in connection with the entry at bar is in the form prescribed by section 16.26(d)(2).

terial, if any, used in its production *or the customs valuation of such material, but to the best of (my) (our) (its) knowledge and belief such* foreign materials as were or may have been used would *not* exceed 20 per centum of the selling price or invoice value of the product covered by this certificate. [Emphasis added.]"

In other words, the regulations specifically eliminate reliance by United States customs officers upon a valuation by Philippine customs officials of the foreign materials used in articles produced in the Philippines and for which reduced duty benefits are claimed as "Philippine articles" upon their importation into the United States.

As the trial court observed, paragraph 1(f) of the Protocol to accompany the 1955 trade agreement reenacts in identical language its predecessor provision, section 2(a)(4) of the Philippine Trade Act of 1946 (22 U.S.C. § 1360(a)(4)). It is instructive to note that the 1962 regulations promulgated under the 1955 trade agreement are almost identical in wording to those in effect under the 1946 Act. (See 19 C.F.R. 16.26, 1949 ed.)

The provisions of these regulations governing Philippine trade have their origin in the Philippine Trade Act of 1946, which effected major changes in our trade and commercial relations with the Philippine Republic as a consequence of its achieving full political independence on July 4, 1946.

The 1946 Act repealed section 301 of the Tariff Act of 1930 (19 U.S.C. § 1301), which had previously governed the duties to be assessed on Philippine articles imported into the United States, and had provided as follows, in pertinent part:

"SEC. 301. PHILIPPINE ISLANDS.

There shall be levied, collected, and paid upon all articles coming into the United States from the Philippine Islands the rates of duty which are required to be levied, collected, and paid upon like articles imported from foreign countries: *Provided*, That all articles, the growth or product of or manufactured in the Philippine Islands from materials the growth or product of the Philippine Islands or of the United States, or of both, or which do not contain foreign materials to the value of more than 20 per centum of their total value, upon which no drawback of customs duties has been allowed therein, coming into the United States from the Philippine Islands shall hereafter be admitted free of duty: *Provided, however*, That in consideration of the exemptions aforesaid, all articles, the growth, product, or manufacture of the United States, upon which no drawback of customs duties has been allowed therein, shall be admitted to the Philippine Islands from the United States free of duty: *And provided further*, That the free admission, herein provided, of such articles, the growth, product, or manufacture of the United States, into the Philippine Islands, or of the growth, product, or manufacture, as hereinbefore defined, of the Philippine Islands into the United States, shall be conditioned upon the direct shipment thereof, under a through bill of lading, from the country of origin to the country of destination: *Provided*, That direct shipments shall include shipments in bond through foreign territory contiguous to the United States: * * * "

It is pertinent to note that section 301 included two conditions for exemption of Philippine articles from United States duty that were subsequently omitted from the 1946 trade act, and thereafter: 1) the Philippines may not have granted the exporter a drawback of customs duties paid on the foreign materials used in producing the articles; and 2) the articles must have come into the United States upon direct shipment from the

Philippines under a through bill of lading.[8]

Furthermore, unlike the 1946 and 1955 trade agreements, section 301 had no provision or guideline for ascertaining the value either of the foreign materials imported into the Philippines or of the Philippine articles coming into the United States.

It is apparent from examination of the customs regulations promulgated under section 301 that, in administering that section, and in determining whether the conditions relative to drawback and direct shipment from the Philippines were met, and whether or not the value of the foreign materials was more than 20 percent of the value of the article exported from the Philippines, the United States customs officials relied, in large part, upon the certificate of origin.

Thus, the 1931 and 1937 Customs Regulations cited by the trial court, required that, to be entitled to admission free of duty, merchandise from the Philippine Islands must be accompanied by a certificate of origin signed and sealed by the appropriate Philippine customs official, or that a bond or deposit of estimated duties be taken to assure its production.

The certificate of origin filed under articles 260(c) and 382(d) of the 1937 Customs Regulations included a certification by the appropriate Philippine customs officer that the imported articles were a growth or product of or manufactured in the Philippines; that none of the foreign materials contained therein exceeded in value 20 percent of the total value of the articles; that no drawback of customs duties was paid and no entry for drawback filed thereon; and that the articles were entered for direct shipment to the United States under a through bill of lading.[9]

Thus, it will be noted, the certificate of origin required under those earlier regulations was designed to meet the conditions set out in section 301 for free entry of Philippine articles, and contemplated an appraisement of the foreign materials by Philippine customs. However, section 301 was repealed by the 1946 Act. Accordingly, the regulations that were applicable prior to enactment of the Philippine Trade Act of 1946 are not relevant to the statute and regulations in issue herein, other than to highlight the statutory changes in effect since that date. And since that date, it is clear that the customs officers in this country need not require ascertainment of value by the Philippine customs officials of foreign materials incorporated in Philippine articles.

This court differs with the trial court's statement that certain references to drawback in the House Ways and Means Committee Report (U.S.Code Cong. Serv., 79th Cong.2d Sess., 1946, pp. 1149–1150), to accompany the bill, H.R. 5856, subsequently enacted as the 1946 Philippine trade act, "evidences a Congressional expectation that the value of the foreign materials in the exported articles be known by the Philippine customs officials prior to exportation of said articles to the United States * * * ." 68 Cust.Ct. at 241, 337 F. Supp. at 910.

The drawback references were contained in a discussion of the definition of "Philippine article" set out in section 2(a)(4) of the bill and, when read in

---

8. A liberal construction of this second condition which also appeared in a predecessor provision, section 5 of the Tariff Act of 1909, may be found in United States v. United Cigar Stores Co., 1 Ct.Cust.Appls. 450, T.D. 31505 (1911), holding that a consignment of Philippine cigars, transshipped at Hong Kong, and thence forwarded to the United States, constituted a "direct shipment" from Manila to the United States within the meaning of section 5. In the course of its opinion, the court summarized the colorful history of the development of trade and commerce in the Orient, noting the eventual ascendancy of Hong Kong over Manila as the dominant port in that area.

9. Although the exact form of the certificate is not prescribed in the 1931 or 1937 Customs Regulations, the form in use at that time is set out in United States v. M. S. Cowen & Co., 32 CCPA 40, C.A.D. 283 (1944).

their entirety, take on a different meaning from that found by the trial court. Particularly pertinent are the statements found on pages 1149–1150 of the House Ways and Means Committee Report. As this court construes what is stated therein, the intendment of the "Philippine article" definition is that the article must have been manufactured or produced in the Philippines "to such an extent that the finished product is identifiable as of Philippine origin even though some imported materials may have been used in the operation." In other words, the foreign material may no longer have a separate identity.

As the report indicates, the same concept of manufacture or production is followed in this country under the drawback statute (19 U.S.C. § 1313), providing for drawback of customs duties upon the "exportation of articles manufactured or produced in the United States with the use of imported merchandise." To obtain drawback under that section, the exported article utilizing foreign materials must have been so manufactured or produced in this country as to acquire an identity as a United States product. See, for example, United States v. International Paint Co., Inc., 35 CCPA 87, C.A.D. 376 (1948), as to what constitutes an article "manufactured" or "produced" in the United States within the meaning of the drawback statute.

The report also notes that the concept of a Philippine "product" is not only similar to that developed over the years under our drawback statutes but is the same as that applied under section 301 of the Tariff Act of 1930 and preceding statutes in allowing duty-free entry of Philippine articles into the United States. See, for example, A. M. Elizalde v. United States, 29 CCPA 28, C.A.D. 166 (1941), and Associated Commercial Co., Ltd. v. United States, 24 CCPA 402, T.D. 48855 (1937), as to what constitutes a growth, product or manufacture of the Philippines.

In summary, the drawback example cited in the Ways and Means Committee Report refers to the meaning of the words "product of the Philippines", as used in the trade agreement act, and not as to whether the value of the foreign materials used in an article should have been ascertained by Philippine customs officials in determinining whether the article qualifies for reduced-duty admission into the United States *"vis-a-vis* the incidence of drawback allowance."

◼ The court concludes that there is no statutory or other requirement that the value of the Belgian fur linings be ascertained by Philippine customs officials at the time of their importation into the Philippines in order for United States customs officials to determine whether their value is more than 20 percent of the gloves imported into the United States; and that such determination may be made by the appropriate customs officials of the United States, subject to the requirement of paragraph 1(f) of the Protocol that it be made under the customs laws of the Philippines in effect at the time of their *importation into that country.*

◼ This court also concludes that the determination by the appraiser as to the value of the Belgian fur linings constituted a part of the appraisement which, like all other "determinations entering into the same", would have become final and conclusive were the timely appeal for reappraisement not filed, and that the trial court was not precluded by statute from considering evidence *de novo* as to the claimed value of the fur linings under Philippine customs law.

It is not questioned that this court may construe the laws of a foreign forum by considering the laws themselves and the testimony of those familiar with them. Dunlap, Alpers & Mott, et al. v. United States, 43 CCPA 159, C.A.D. 624 (1956). Indeed, construction of foreign laws is often a prerequisite to the court's determination of certain issues such as those arising under the countervailing duties provision, section 303, Tariff Act of 1930, where the court

must determine whether a bounty or grant was in fact bestowed by the foreign country of manufacture upon an article imported into the United States, thus justifying the imposition thereon of countervailing duties by the Secretary of the Treasury. See American Express Company v. United States, 60 CCPA ——, C.A.D. 1087 (1973).

Consequently, the trial court erred in not considering the evidence of record with respect to the fur linings, and determining whether appellant had affirmatively established its claim.

Prior to passage of the Customs Courts Act of 1970, an appellate term of this court was authorized in reappraisement proceedings to pass on questions of fact as well as of law and, in general, to do anything the trial judge could have done except expand the record. D. C. Andrews International v. United States, 59 CCPA 38, C.A.D. 1033, 450 F.2d 1127 (1971); Automatic Totalisators, Inc. v. United States, 29 CCPA 230, C.A.D. 195 (1942). It could, under section 2636 of title 28, U.S.C., "affirm, reverse, or modify the decision of the single judge or remand the case to such judge for further proceedings * * * ."

█ Under the particular circumstances of this case, the sufficiency and weight of the record evidence pertaining to the value of the Belgian fur linings under Philippine customs laws at the time of importation into that country should be determined initially by the trial judge. Rattancraft of California, et al. v. United States, 69 Cust.Ct. 262, A.R.D. 308, 351 F.Supp. 1401 (1972).

Accordingly, the case is remanded to the trial court with directions to consider the testimonial and documentary evidence of value of the foreign materials incorporated in the imported gloves, and to make such findings with respect to the claimed value of the linings as are appropriate to the issues presented.

Judgment will be entered accordingly.