(R.D. 11778)

ROSS GLOVE COMPANY *v.* UNITED STATES

Reappraisement No. R68/11664

(Decided on remand [A.R.D. 318] August 17, 1976)

*Mayer, Brown & Platt (Walter Treumann* and *J. Stanley Stroud* of counsel); *Barnes, Richardson & Colburn (Joseph Schwartz* and *Earl R. Lidstrom* of counsel), associate counsel; for the plaintiff.

*Rex E. Lee,* Assistant Attorney General (*Brian S. Goldstein* and *Patrick D. Gill,* trial attorneys), for the defendant.

RICHARDSON, Judge: The merchandise in this appeal for reappraisement consists of 624 dozen pairs of fur-lined leather gloves which were exported from the Philippine Islands on August 31, 1962, and appraised upon entry at Milwaukee, Wisconsin, at U.S. $25.77 per dozen pairs, net, packed, on the basis of constructed value as defined

in 19 U.S.C.A., section 1401a(d) (section 402(d), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956). The plaintiff-importer does not challenge the basis of value or the return of value made in the appraisement. Plaintiff contends that the value of the foreign materials used in the manufacture of the gloves in the Philippine Islands did not exceed 20 percent of the U.S. appraised value of the gloves, and as such, the gloves should have been advisorily classified by the appraiser as "Philippine articles" so as to be eligible [upon liquidation] for the reduced rate of duty accorded "Philippine articles" under the provisions of the Philippine Trade Agreement of 1946 as revised pursuant to the Philippine Trade Agreement Revision Act of 1955 (69 Stat. 413), which, in this case, amounts to 20 percent of the ordinary customs duty assessed on Philippine articles.

The Government disputes plaintiff's contention, and under the law of the case, the court is required in this proceeding to determine if plaintiff has established the value of the foreign materials in the gloves in accordance with the customs laws of the Philippines. See *Ross Glove Company* v. *United States,* 71 Cust. Ct. 219, A.R.D. 318, 363 F. Supp. 1395 (1973), reversing and remanding *Ross Glove Company* v. *United States,* 68 Cust. Ct. 236, R.D. 11763, 337 F. Supp. 907 (1972).

The applicable customs laws of the Republic of the Philippines were introduced into the record through the testimony of Jesus B. Bito, a Philippine Lawyer who specializes in customs and tax cases in that country. The text of these laws is contained in section 201 of the Tariff and Customs Code of the Philippines (Republic Act No. 1937) which reads:

> Sec. 201. *Basis of Dutiable Value.* — Whenever an imported article is subject to an *ad valorem* rate of duty, the duty shall be assessed upon the market value or price at which, at the time of exportation, the same, like or similar article is freely offered for sale in the principal markets of the exporting country for exportation to the Philippines, in the usual wholesale quantities and in the ordinary course of trade (excluding internal excise taxes to be remitted or rebated), plus ordinary expenses prior and incidental to the lading of such article on board the vessel or aircraft at the port of export (including taxes or duties, if any) and freight paid as well as insurance premium paid covering the transportation of such article to the port of entry in the Philippines.
>
> When the value of the article cannot be ascertained in accordance with the preceding paragraph, the value shall be the domestic wholesale market value or selling price of the same, like or similar imported article in the principal market of the Philippines on the date of exportation of the article under appraisement, in the usual wholesale quantities and in the ordinary course of trade, minus the import duty and other taxes as well as a

commission not exceeding six *per centum* if any has been paid or contracted to be paid on goods secured otherwise than by purchase, and profits not to exceed eight *per centum* and a reasonable allowance for general expenses not to exceed eight *per centum* on purchased goods, and all other expenses incidental to the delivery from the port of importation to the principal market in the Philippines.

As this statue indicates, dutiable value in the Philippines is predicated primarily upon an *export value*, and alternatively, upon *domestic market value*. In this case plaintiff apparently relies upon the export value provision, having introduced no evidence directed toward the establishment of a domestic market value.

On the matter of Philippine export value Carl Ross, plaintiff's president and a stockholder, testified that he is in charge of plaintiff's sales, its major purchasing and also handles the importation of gloves. He stated that he is familiar with the 624 dozen pairs of fur-lined gloves covered by the invoice at bar, having seen them at the time of their arrival at plaintiff's factory in Sheboygan, Wisconsin. He testified that the only material in the imported gloves that came from a country other than the Philippines or the United States is the cut rabbitskin lining and that the linings were imported into the Philippines under customs bond from Belgium by Carla Trading Corporation, Ltd. a Bahamian corporation in which he is a stockholder and an officer, and there sold to plaintiff who caused the linings to be processed into the imported gloves by Ross Glove Manufacturing, a Philippine division of Carla Trading Corporation, Ltd. consisting of a team of laborers assembled in the Philippines for that purpose by the parent corporation.

The 624 dozen pairs of linings involved in the imported gloves in issue are said by the witness Ross to be part of a shipment of 1,016 dozen pairs of linings shown by documentation in the record as going from Antwerp, Belgium in April, 1962 and arriving in Manila, Philippine Islands in June, 1962 (Import Entry – collective exhibit 3), and leaving the Philippine Islands in three exporting vessels between August 20 and September 15, 1962 (Application for Bond Cancellation – exhibit 2). His testimony in this regard is based upon records given to him by the manager of Ross Glove Manufacturing and certified by the customs storekeeper in the Philippines.

Mr. Ross testified that the 1,016 dozen pairs of linings were purchased by Carla Trading Corp. acting through plaintiff, under contract dated January 22, 1962 with Peausserie de Destelbergen, a Belgian company located near Ghent, Belgium, covering 4,564 dozen pairs of precut rabbitskin linings at a price of U.S. $4.82 per dozen pairs f.o.b. Antwerp, plus packing of U.S. $30 per delivery. The contract received in evidence as exhibit 5 reads in part:

3) The 4,564 dozen shall be delivered in six monthly deliveries, namely five deliveries of 600 dozen men's and 144 dozen children's; the sixth delivery of 700 dozen men's and 144 dozen children's, subject to unforeseen contingencies or acts of God. The first shipment is intended for March 1962.

4) The invoices shall be drawn up and sent to the name of CARLA TRADING CORPORATION, Nassau, Bahamas. Copy will be sent to the Ross Glove Company. The merchandise will be turned over to the forwarder, the firm of J. P. Best & Co. of Antwerp, at the disposition of Ross Glove Company, Sheboygan.

Mr. Ross also identified other documents connected with this transaction, namely, a bill of lading, dated April 17, 1962, and signed by the forwarder John P. Best & Co. of Antwerp, Belgium, covering 10 bales of rabbitskins, to which is attached a packing slip and an invoice from Destelbergen (collective exhibit 4), and a freight bill for 10 bales of rabbitskins from the forwarder John P. Best & Co. to plaintiff stamped paid under date of May 10, 1962 (exhibit 6). On the documents generated by the forwarder, namely, the bill of lading and the freight bill, the destination MANILA by way of M/S CEYLON appears.

The witness also testified that on the basis of experience he acquired in his travels to and dealings in Belgium that the market for this merchandise was centered in and around Ghent, Belgium and that it evolved around three suppliers of precut rabbitskin linings of the same quality, namely, Destelbergen and Scaldis of Ghent, and Ed. Block of Merelbeke which is near Ghent. According to the witness, plaintiff has done business with the Block establishment involving the shipment of precut rabbitskin linings in March and April of 1962 from Belgium to Manila in the same format as characterized its dealings with Destelbergen. Mr. Ross stated that all costs to make the shipment and deliver it to Antwerp, Belgium were included in the purchase price except the packing which was extra, and that on the basis of his experience in buying linings from Belgium, the purchase price did not depend upon quantity, and that the purchases were made in the ordinary course of trade and were not unusual transactions between companies which were not related to the suppliers.

Rudolph Frenville, a partner in the firm of M. Frenville & Co., New York importers of pickled skins and fur linings, testified that his firm has purchased precut fur linings from Scaldis and Block and that he has heard of Destelbergen but has not done business with that company. He stated that in February of 1962, his firm purchased 3,000 dozen pairs of precut men's fur linings from Scaldis at a price of $4.80 f.o.b. Antwerp, plus packing under an exclusive arrangement with the supplier to buy its entire output and these linings were resold by Frenville to plaintiff for shipment to Manila at the price of $5.30, c.i.f. Manila.

Mr. Bito testified that under the Philippine export value statute the Scaldis price for precut linings ($4.84) is ruled out as a basis for finding export value because a Philippine importer could not purchase this merchandise by reason of the exclusive arrangement involving a U.S. customer. The witness stated, "We also have to consider that the merchandise should be freely offered for sale in the usual wholesale quantities and in the ordinary course of trade." (R. 224) Mr. Bito was of the opinion that an export value under the statute could be based upon the Destelbergen price of $4.86 plus actual freight and insurance, if any, because it puts all Philippine importers on an equal level at one uniform dutiable value for the same, like or similar article. His opinion was based upon the assumption of fact, among others, that Destelbergen *contracted* in Belgium *with plaintiff to sell* it 4,564 dozen pairs of precut rabbitskin linings *for exportation to the Philippines* at that price inclusive of packing charges. (R. 218)

Plaintiff, relying on its Destelbergen transactions, contends that the record establishes that the value of the foreign materials in the gloves, as ascertained in accordance with Philippine law, did not exceed 20% of the appraised value of the imported gloves. Plaintiff argues, "This evidence provides ample basis for Mr. Bito's expert opinion that the Destelbergen price of $4.86 per dozen pairs ($4.82 plus 4¢ packing) was the applicable market value or price for the linings in the gloves in question under then-effective Philippine customs law . . ." (plaintiff's brief, page 38). Defendant contends that plaintiff has failed to prove its claim of export value under Philippine law. Defendant argues, "We submit that plaintiff has utterly failed to offer any probative or convincing proof as to what the value of the fur linings would have been as ascertained under the customs laws of the Philippines." (defendant's brief, page 13)

The court agrees with defendant in this case. In the light of testimony elicited from the witness Bito which reveals the Philippine export value law to be not unlike our own export value statutes in some important aspects, i.e., freely offered price, usual wholesale quantities, ordinary course of trade, it is clear to the court that the evidence presented by plaintiff lacks probative force in establishing that the Belgian fur-lining manufacturer's (Destelbergen) price conformed to the requirements of Philippine export law. Putting aside the confusion fostered by this record as to the identity of the contracting party doing business with Destelbergen, the only evidence in the record relating to value other than the testimony of the expert witness, is derived entirely from persons occupying the status of *purchasers* of rabbit fur linings. And there is nothing in the record which demonstrates the competency of these *purchasers* to authoritatively speak about the seller-manufacturer's sales policies and practices which a

court would need to know in order to properly apply Philippine export value law to the evidence in the case.

Some statement from the seller itself on the subject is a must. And a purchaser does not normally possess this knowledge. *Cf. B & W Wholesale Co., Inc.* v. *United States,* 63 Cust. Ct. 691, A.R.D. 262 (1969), affirmed, 58 CCPA 92, C.A.D. 1010, 436 F. 2d 1399 (1971); *Samuel S. Perry* v. *United States,* 21 Cust. Ct. 286, Reap. Dec. 7614 (1948).

In A.R.D. 262 the appellate term of this court, in a similar context involving a statement under oath of an alleged buying agent to the effect that the manufacturers of various imported articles had offered and sold their goods to anyone who wished to buy at ex-godown prices, rejected such evidence, stating (p. 698), "affiant Matsumoto did not establish in the affidavit his competency to know what the manufacturers' sales practices were at the time of exportation here involved. He is not shown to be connected with any of the manufacturing concerns in any way, and his relationship to them as an alleged buying agent only commenced in the same year of which he speaks in the affidavit, namely, 1961. From such poor vantage point Matsumoto is not, in our opinion, in a position to speak authoritatively on the subject of the manufacturers' sales practices in the country of exportation on the broad spectrum necessary in a reappraisement case."

In R.D. 7614 the reappraising judge rejected the testimony of the importer to the effect that there was a free open market price to anyone who wanted to buy whether for export or for home consumption, based upon his visits to the manufacturers. The court stated (p. 288), "It has been held that a statement of a *manufacturer* that he is willing to sell to anyone at the price charged the importer is no proof of market value in the absence of evidence of sales or offers to sell at the prices noted on the invoices. [Citations omitted.] A similar unsupported statement by an *importer* is likewise insufficient proof of market value."

In the instant case the witness Ross admitted on cross-examination that he did not know who else Destelbergen or Block sold to during this period. (R. 150) Consequently, it is inconceivable to the court that he could know what offers Destelbergen made to others and at what prices, terms and conditions and in what quantities.

Moreover, although the Destelbergen contract is heralded by the witness Ross and his counsel as providing for monthly shipments starting in March of 1962 "from Belgium to Manila, Philippines" (R. 54), this posture is not borne out by the document itself (exhibit 5). As counsel for the Government aptly observed at the trial with respect to the Destelbergen course of conduct (R. 85) there is nothing in its documentation of the transaction with plaintiff to indicate that

the transaction was for exportation to the Philippines. The contract in issue (exhibit 5) goes no further than to determine a price f.o.b. Antwerp and to provide for delivery of the merchandise to plantiff's forwarding agent in Belgium. Thus, destination of the merchandise was not a factor in the contractual negotiations consummated between Destelbergen and plaintiff. Destination of this merchandise clearly appears only to have been worked out between plaintiff and its forwarding agent Best, being bought and paid for separately by plaintiff and wholly apart from its dealings with Destelbergen. Consequently, there is no evidence in the Record that Destelbergen offered to sell the fur linings in issue for exportation to the Philippines, or for that matter, was disposed toward selling this merchandise to Philippine purchasers or importers—a necessary circumstance upon which the opinion of the witness Bito was premised.

It follows, therefore, that plaintiff has failed to prove the value of the linings in the imported gloves in accordance with applicable Philippine export value law and that the appraiser erred in not advisorily classifying the gloves as "Philippine articles". On this record the court finds as facts:

1. That the merchandise in issue consists of 624 dozen pairs of fur-lined men's leather gloves which were manufactured in the Philippines with fur linings which were not of Philippine or United States origin, and exported therefrom to the United States on or about August 31, 1962.

2. That said merchandise was appraised upon entry at the port of Milwaukee, Wisconsin, at $25.77 per dozen pairs, net, packed, on the basis of constructed value as defined in 19 U.S.C.A., section 1401a(d) (section 402(d), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956).

3. That there is no probative evidence in the record of the value of the fur linings in said gloves in accordance with the customs laws of the Republic of the Philippines and as of the time of their importation into the Philippine Islands.

On these facts the court concludes as matters of law:

1. That the plaintiff has failed to rebut the presumption of correctness attaching to the appraised values.

2. That constructed value as defined in 19 U.S.C.A., section 1401a(d) (section 402(d), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956) is the proper basis for determination of the value of the merchandise herein.

3. That such constructed value is the appraised value herein.

Judgment will be entered herein accordingly.